**Deborah CHANGKIT, Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent.**

**No. 08–AA–615.**

District of Columbia Court of Appeals.

Submitted March 17, 2010.

Decided May 6, 2010.

---

Scott W. Doyle, Washington, DC, and Henry P. Van Dyck were on the brief for petitioner.

Peter J. Nickles, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and David A. Hyden, Assistant Attorney General, were on the brief for respondent.

Before PRYOR, SCHWELB, and KING, Senior Judges.

SCHWELB, Senior Judge:

Deborah Changkit has asked this court to review a decision of the Compensation Review Board (CRB) of the District of Columbia Department of Employment Services (DOES), issued on May 16, 2008, affirming a compensation order entered by an Administrative Law Judge (ALJ) on February 26, 2008, denying Ms. Changkit's application for reinstatement of her temporary total disability (TTD) benefits. Ms. Changkit contends that the ALJ failed to accord appropriate weight to the opinions of her treating physicians and that he made a number of related errors of fact and law. We reverse the decision of the CRB and remand the case with directions to reinstate Ms. Changkit's benefits.

## I.

### PROCEDURAL AND FACTUAL BACKGROUND

Ms. Changkit worked as a laboratory technician with the District of Columbia Department of Human Services (DHS) from 1988 until 1993. On October 4, 1993, Ms. Changkit fell while she was at work, and she severely injured her back and left knee. Ms. Changkit filed a timely claim for workers' compensation benefits for her injuries, and she was initially paid such benefits. On August 3, 1994, however, Ms. Changkit's benefits were terminated by the Office of Disability and Crime Victims' Compensation (ODCVC). The termination of benefits was based on a medical report dated June 2, 1994 by Louis Levitt, M.D., who has remained a central figure in this controversy for the past sixteen years.

Dr. Levitt had evaluated Ms. Changkit at ODCVC's request. *Id.* In his report, Dr. Levitt found that Ms. Changkit had "no permanent injury . . . exclusively attribut[able] to the October 4, 1993 work trauma." Rather, Dr. Levitt concluded that Ms. Changkit's back and knee pain was attributable to a 1987 motor vehicle accident in which she was injured prior to her accident at work. *Id.*

Ms. Changkit contested the ODCVC's decision to terminate her benefits. At a hearing held on January 18, 1995, Ms. Changkit rebutted Dr. Levitt's report by

introducing the medical opinions of her three treating physicians, who were all of the opinion that Ms. Changkit's back and knee injuries were causally related to her work injury, and that she was totally disabled. On June 13, 1995, the hearing examiner issued an order in which he accepted the opinions of Ms. Changkit's treating physicians and rejected Dr. Levitt's contrary conclusions. On June 14, 1995, the Deputy Director of DOES for Labor Standards issued a Final Compensation Order in which he upheld the hearing examiner's decision and awarded Ms. Changkit continuing temporary total disability benefits and compensation for related medical expenses.

Based on the foregoing order, Ms. Changkit received her benefits for almost four years. On April 14, 1999, however, her benefits were again terminated. Once again, termination was sought, in part, on the basis of a report by Dr. Levitt. Dr. Levitt examined Ms. Changkit, this time at the request of the "Third Party Administrator" for the District of Columbia's workers' compensation plan, and he concluded, once again, that notwithstanding Ms. Changkit's "subjective complaints of pain," her "physical condition was unremarkable with no evidence of active pathology about the spine or extremities." *Id.* Ms. Changkit was also examined, *inter alia,* by Donald K. Nelson, M.D., who concluded in a six-page neurological opinion that she was no longer disabled from performing her regular duties as a medical technician.

Ms. Changkit appealed from the termination to a DOES Hearing and Appeals Examiner. On October 27, 1999, following a hearing, the examiner issued a recommended decision in which he concluded that Ms. Changkit was no longer entitled to receive disability benefits. In reaching this decision, however, the examiner relied on Dr. Nelson's analysis, but he explicitly declined to consider Dr. Levitt's recommendation, citing Dr. Levitt's perceived lack of impartiality:

> The record clearly reveals Dr. Levitt examined claimant in 1994 as well as in 1998. On this record, however, I am persuaded employer's reliance on Dr. Levitt's medical position is misplaced. There is clearly a question of Dr. Levitt's ability to serve as an "impartial medical examiner" when he has previously examined claimant following the original injury and has a written record of his observations and diagnoses. To rely upon Dr. Levitt's medical opinion in this case would certainly contravene the level of impartiality which employer strives to maintain in these types of cases. Accordingly, I am persuaded Dr. Levitt's medical opinion shall not be considered herein.

Ms. Changkit challenged the Hearing and Appeals Examiner's recommended decision before the Director of DOES. The Director concluded that the examiner had not provided adequate reasons for rejecting the opinions of Ms. Changkit's treating physicians, and that the examiner's finding that Ms. Changkit was no longer suffering from a disability causally related to her 1993 work accident was not supported by substantial evidence. As a result of the Director's decision, Ms. Changkit's benefits were again reinstated.

On November 9, 2006, the District of Columbia's Disability Compensation Program terminated Ms. Changkit's disability benefits for a third time. This decision to do so was based on a third medical opinion by Dr. Levitt, issued on June 6, 2006. Dr. Levitt again concluded, as he consistently had since 1994, that the condition of Ms. Changkit's back was not attributable to her accident at work. Rather, in Dr. Levitt's view, Ms. Changkit was experiencing

a naturally progressing symptom of a preexisting "degenerative disc disease to the lumbar spine." With respect to Ms. Changkit's knee, Dr. Levitt wrote that he "did not have specific evidence" regarding prior medical procedures and that "it would be impossible to rate her impairment with the information available."

Ms. Changkit appealed from the third termination of her benefits to the Office of Hearings and Adjudication (OAH). On February 20, 2007, an ALJ of the OAH held an evidentiary hearing to consider Ms. Changkit's claim. Ms. Changkit testified that she was in constant pain, and that her condition had not improved since the date of her fall at work. She stated that

> [after] the [1989] car accident I was still able to work. I had some pain. As it got later, closer to the surgery there was a lot of pain. But after I fell I was in excruciating pain all the time. It wasn't just sometimes, it was all the time. I couldn't bend, I couldn't sit, I couldn't lay, I couldn't pull up my underwear[ ] most of the time[ ]. I needed help. I couldn't come down the steps.

Ms. Changkit testified that as of the date of the hearing, she was still taking various medications to manage her pain. She asserted that she was forced to spend most of her day lying down, that she was unable to perform simple chores around the house or to go shopping, and that she could not do any lifting or carrying. According to Ms. Changkit, the pain caused her to stand up ever twenty or thirty minutes after sitting. She claims that she could comfortably stand only for about fifteen minutes. Ms. Changkit testified that her pain medication "doesn't alleviate the pain" but "just helps for a moment." [1]

At the hearing before the ALJ, Ms. Changkit also introduced the medical reports of her treating physicians. Several of these reports had been admitted in her hearings in 1995 and 1999, and they had been relied on in each case as grounds for awarding or continuing her benefits. Specifically, Ms. Changkit's medical evidence included the opinions of Daniel Glor, M.D., Earl Mills, M.D., James Uy, M.D., and Patrick Noel, M.D. We summarize these opinions below.

### 1. *Daniel Glor, M.D.*

Shortly after her October 4, 1993 accident, Ms. Changkit was treated by Dr. Daniel Glor, a neurologist with Group Health Association/Humana. Dr. Glor also treated Ms. Changkit before her work-related accident, and he was therefore in a position to make a reasoned judgment regarding whether there was a relationship between Ms. Changkit's symptoms before and after October 4, 1993. Based upon his examinations, Ms. Changkit's treatment history, as well as diagnostic tests performed both before and after Ms. Changkit's accident, Dr. Glor concluded:

> I have been following Ms. Deborah Changkit in the Neurology Department ... since 3/7/90....

> Ms. Changkit did fairly well [after her back surgery] from 4/92 through 10/4/93. On that date, while at work, she slipped and fell ... and subsequently developed low back and left leg pain similar to what she had felt prior to surgery. The pain would also radiate down the right leg to a lesser extent. I saw Ms. Changkit for these symptoms on 4/22/94.... There apparently is a question [from other doctors] as to whether

---

1. In his report, Dr. Levitt expressed the view that Ms. Changkit "was adequately treated for any work injury that she sustained in 1993" and that her claimed disability was exacerbated by what he characterized as her "less than optimal effort." Dr. Levitt was "astonished that she continue[d] to remain out of gainful employment."

her symptoms are work related. She was doing quite well until she slipped at work on 10/4/93, so the symptoms are obviously work related.

### 2. *Earl Mills, M.D.*

Dr. Earl Mills treated Ms. Changkit on approximately twenty-five occasions from May 1994 until April 1999. During this five-year period, Dr. Mills was consistently of the opinion that Ms. Changkit was disabled. *Id.* On November 13, 1998, Dr. Mills wrote:

> It is quite clear that this lady is neither getting worse or better except for maybe her left knee where the pain has been quite prominent.... [A]s far as her back is concerned she remains totally disabled for work in any capacity. She is still a candidate for lumbar spinal surgery.... However, we cannot guarantee her the outcome of any operative procedure involving her back. She is not a candidate for rehabilitative modalities nor a candidate for any work efforts.

In a letter dated April 5, 1999 discussing Ms. Changkit's condition, Dr. Mills stated:

> As you are fully aware, it has long been established that Ms. Changkit suffered a work injury on 10/04/1993. As a direct result of that injury, she sustained trauma to her L5–S1 disc level, a site of prior surgery in 1992 from which she had essentially recovered and returned to her full time job.... Let me categorically state that the natural history for someone who is recovering or has recovered from back surgery and has returned to full time work is simply to

continue progressing. In the case of Ms. Changkit, her work injury of 10/4/1993 inflicted upon this patient a combination of severe lumbosacral sprain and once again a disruptive injury to the L5–S1, disc/disc space. That degree of disruption indeed did promote osteophytosis (Bone spurs) of L5–S1, with impingement.... [2]

### 3. *Patrick Noel, M.D.*

From April 2004 until January 2007, Patrick Noel, M.D., treated Ms. Changkit for her back and knee pain a total of fifteen times. In three separate evaluations written over a two and one half year period dated May 28, 2004, July 11, 2006, and January 10, 2007, Dr. Noel concluded that Ms. Changkit was disabled and that her disability was causally related to her accident at work. Specifically, on May 28, 2004, Dr. Noel wrote that "after having reviewed the entire record I agree with the general opinion ... that the patient is disabled on the basis of her work related injury and will keep her under medical care for her continuing problems and order appropriate studies as indicated." On July 11, 2006, in a report written after he had examined Ms. Changkit eleven times, Dr. Noel "disagree[d] with any of us who has seen the patient on a contemporary basis and come to the conclusion that the work related injuries are not the cause of the current problems, chronic pain and inability to work and perform the activities of daily living." Dr. Noel wrote on this

---

**2.** In October and November 1995, Dr. Mills referred Ms. Changkit to James Uy, M.D. Dr. Uy administered three epidural injections to Ms. Changkit's lumbar area to try and stem her "severe, constant pain radiating to both lower extremities." Dr. Uy examined Ms. Changkit three times. In his second examination, Dr. Uy found that Ms. Changkit had a "positive" straight leg elevation test and that there was "some muscle spasm of the lower thoracic and upper lumbar of the left paravertebral muscles." Dr. Uy was not asked to express an opinion as to the relationship between Ms. Changkit's accident and her condition, and he did not do so.

occasion that "[i]n my opinion the best way to evaluate the relationship of her current problems to her injuries is through the documentation of the treating physicians close to the date of her work related injury as is possible." Finally, on January 10, 2007, Dr. Noel reported that Ms. Changkit is "judged currently as unable to work" and that she "has chronic pain and should be treated for chronic pain." He added that "physical therapy will help for short periods but ultimately will not remove the low back pain."

The employer, DHS, called no witnesses before the ALJ and did not file a brief. Instead, DHS relied exclusively on the third "independent medical evaluation" (IME) by Dr. Levitt. In his Compensation Order, the ALJ synopsized that evaluation as follows:

> In his report, Dr. Levitt recount's [sic] Claimant's subjective complaints and her treatment history. He performed a physical exam and found normal flex function and lumbar motors and sensory were within normal range but with pain. He notes a substantial history of preexisting disease related to the left knee and lower back and residuals from the Claimant's laminectomy and an arthroscopy not related to her work injury. He attributes Claimant's current condition to arthritic changes as a result of prior unrelated conditions and not a consequence of any structural changes that occurred in October 1993. Dr. Levitt opines Claimant has reached maximum medical improvement with respect to the work injury and her current condition is not related to her work injury.

---

**3.** Dr. Mills took over the treatment of Ms. Changkit from Dr. Glor in 1994 because Dr. Glor's HMO did not accept workers' compensation cases.

## II.

### THE DECISIONS OF THE ALJ AND THE CRB

In his order of February 26, 2008, the ALJ held that Ms. Changkit was no longer entitled to disability benefits. The ALJ noted that "[g]enerally, greater weight is accorded to the treating physician's opinion," but he concluded that the general rule did not apply in this case. Noting that Ms. Changkit was relying on reports by Dr. Glor, who had treated Ms. Changkit from 1990 to 1994, and by Dr. Mills, who had last treated Ms. Changkit in April 1999,[3] the ALJ rejected the views of these physicians as "stale." According to the ALJ, "[t]he evidence Claimant relies upon is deemed too remote in time to give due consideration as to whether her condition has changed." Remarkably, the ALJ then rejected the opinion of Dr. Noel, who had examined Ms. Changkit numerous times over the period from 2004 to 2007:

> Little weight was accorded to the opinion of Dr. Noel that claimant's current complaints are related to the work injury because Dr. Noel expressly states that his opinion was based on a review of the reports from Drs. Mills and Glor which have been rejected as stale.

Summarizing his legal analysis, and referring to Dr. Levitt's IME, the ALJ wrote that "the forgoing [sic] is sufficient to meet the Employer's initial burden," and that "[n]ow claimant has the burden of production[4] to rebut employers [sic] evidence." Because he regarded the evidence presented by Ms. Changkit as either "stale" or based on stale evidence, the ALJ concluded that Ms. Changkit had not carried that burden.

Ms. Changkit then appealed to the Com-

---

**4.** Presumably, the ALJ meant the burden of "persuasion."

pensation Review Board[5] and on May 26, 2008, the Board affirmed the ALJ's decision. The Board wrote, in pertinent part, that "[t]he record fully supports the ALJ's thorough, well reasoned decision, and the Panel, therefore, adopts the reasoning and legal analysis expressed by the ALJ in that decision in affirming the Compensation Order in all respects." Ms. Changkit filed a timely petition for review by this court.

## III.

## LEGAL ANALYSIS

A. *The Standard of Review*

■■■ Ms. Changkit was employed by the District of Columbia at the time of her injury, and her claim for workers' compensation benefits is therefore governed by the Comprehensive Merit Personnel Act (CMPA). *See* D.C.Code §§ 1–623.01 *et seq.* (2001). We review decisions applying the CMPA under the "substantial evidence" standard. *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Employment Servs.*, 926 A.2d 140, 146–47 (D.C.2007). Specifically, this court "must determine first, whether the agency has made a finding of fact on each material contested issue of fact; second, whether the agency's findings are supported by substantial evidence on the record as a whole; and third, whether the Board's conclusions flow rationally from those findings and comport with the applicable law." *Id. (quoting Mills v. District of Columbia Dep't of Employment Servs.*, 838 A.2d 325, 327 (D.C.2003)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fontenot v. District of Columbia Dep't of Employment Servs.*, 804 A.2d 1104, 1106 (D.C.2002) (*quoting Consolidated Edison Co. v.*

*NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). "The corollary of this proposition is that if the [CRB's] findings are *not* supported by substantial evidence, they cannot be sustained, and we are required to set them aside." *Potomac Elec. Power Co. v. District of Columbia Dep't of Employment Servs.*, 835 A.2d 527, 530 (D.C.2003) (citation omitted, emphasis in original). We will reverse an administrative ruling only if it is "arbitrary, capricious, or otherwise an abuse of discretion and not in accordance with the law." *Landesberg v. District of Columbia Dep't of Employment Servs.*, 794 A.2d 607, 612 (D.C.2002).

B. *The Treating Physician Preference*

■■■ "[I]n workers' compensation cases, the medical opinion of a treating physician is generally entitled to greater weight than the opinions of doctors who have been retained to examine a claimant solely for the purpose of litigation." *Kralick v. District of Columbia Dep't of Employment Servs.*, 842 A.2d 705, 711 (D.C. 2004) (collecting cases). While a hearing officer, as the trier of fact, is entitled to reject the testimony of a treating physician, he may do so only "if the examiner sets forth *specific and legitimate reasons for doing so.*" *Mexicano v. District of Columbia Dep't of Employment Servs.*, 806 A.2d 198, 205 (D.C.2002) (emphasis added) (*quoting Olson v. District of Columbia Dep't of Employment Servs.*, 736 A.2d 1032, 1041 (D.C.1999)).

■■■ The rationale for the treating-physician preference is twofold. In comparison with an assessment by a doctor who has been retained solely for purposes of litigation, a treating physician's opinion is considered more reliable because the treating physician is "(1) less apt to be

---

**5.** The Board did not yet exist at the time of Ms. Changkit's earlier administrative appeals.

consciously or subconsciously biased by the litigation, and (2) more likely to be familiar with the patient's condition because he or she has typically spent a greater amount of time with the patient." *Kralick,* 842 A.2d at 712. At the core of this second prong is the common sense principle that a physician who has treated a patient over a substantial period of time is likely to have more insight into the patient's condition than a doctor who has had only one or two interactions with a patient and who has examined the patient in the context of possible or actual litigation.

▮ Where an agency or hearing officer has not accorded preference to the opinion of a treating physician, and has failed to provide an adequate explanation for the decision not to do so, this court will not allow the resulting ruling to stand. *See, e.g., id.* at 705 (reversing where the ALJ's explanation for rejecting the treating physician's opinion was based on a misapprehension of fact); *Mexicano,* 806 A.2d at 205 (holding that the hearing examiner rejected the treating physician's opinion for insufficiently persuasive reasons); *Clark v. District of Columbia Dep't of Employment Servs.,* 772 A.2d 198, 204 (D.C.2001) (setting aside administrative decision because the hearing officer failed to give adequate consideration to the deposition testimony of a treating physician); *Upchurch v. District of Columbia Dep't of Employment Servs.,* 783 A.2d 623, 629 (D.C.2001) (setting aside administrative

decision because "[e]ven assuming, *arguendo,* that the examiner did consider the [treating physician's] deposition, she failed to explain [satisfactorily] why she rejected his opinion, as explicitly mandated by the law in this jurisdiction").

### C. *Application of the Treating Physician Preference to the Record*

▮ In this case, the ALJ's stated reason for rejecting the opinions of Dr. Glor and Dr. Mills was that the reports were "too remote in time to give due consideration as to whether [Ms. Changkit's] condition has changed." His explanation of his rejection of Dr. Noel's July 11, 2006 and January 10, 2007 reports was that these evaluations were "based on a review of the reports from Drs. Mills and Glor which have been rejected as stale." *Id.* We conclude that the ALJ's decision to reject the opinions of Dr. Glor, Dr. Mills and (especially) Dr. Noel was based on dispositive mistakes of fact and law.[6]

To the extent that the ALJ's characterization of the opinions of Dr. Glor and Dr. Mills as "stale" was meant only to suggest that a patient's condition may change over the years, it was not unreasonable, although in this case Dr. Mills' 1998 and 1999 evaluations, quoted at p. 385, *supra,* did suggest that Ms. Changkit's prospects for improvement were less than auspicious. If the ALJ intended, on the other hand, to suggest that the views of the two initial

---

6. D.C.Code § 1–623.24(d)(4) provides that "[a]n award for compensation may not be modified because of a change to the claimant's condition unless:

  (A) The disability for which compensation was paid has ceased or lessened;
  (B) The disabling condition is no longer causally related to the employment;
  (C) The claimant's condition has changed from a total disability to a partial disability;
  (D) The employee has returned to work on a full-time or part-time basis other than

vocational rehabilitation under § 1–623.04; or
  (E) The Mayor or his or designee determines based upon strong compelling evidence that the initial decision was in error.
The ALJ did not specifically identify which of these sub-sections he was applying, but we infer, in light of prior adjudications in Ms. Changkit's favor, that he was relying on sub-section (B).

treating physicians were so stale as to be irrelevant and unworthy of any consideration—and his tone and language are susceptible of that construction—then that suggestion is surely unreasonable. At the very least, in this kind of case, "the past is prologue," and it sheds much needed light upon the contested present. It is difficult to understand how a physician (or a trier of fact) could determine whether the patient's condition has improved sufficiently to warrant termination of benefits without a thorough examination and understanding of the nature of the patient's injuries and of his or her condition at the time they were incurred or soon thereafter.

But even assuming that the ALJ's characterization of the earlier examinations as "stale" was merely a reference to the inevitable consequences of the lapse of time, his rejection of the opinion of the current treating physician—Dr. Noel—cannot be reconciled with the record or with the treating physician preference. The essence of this aspect of the ALJ's decision is that Dr. Noel's opinion was based, largely or exclusively, on the earlier evaluations by Dr. Glor and Dr. Mills, and it is true that Dr. Noel attached substantial significance to these evaluations. See pp. 385–86, *supra*. But we agree with counsel for Ms. Changkit that "[i]t should require no citation to medical texts to conclude that when a doctor begins treating a new patient he has a duty to familiarize himself with a patient's past treatment history, and that the doctor may rely on that history in making treatment decisions. Indeed, this court has approved an Administrative Law Judge's rejection of a doctor's medical

report because, *inter alia*, the doctor 'did *not* review pertinent medical reports of the treating physician.' *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Employment Servs.*, 827 A.2d 35, 42 (D.C.2003)." To the extent that the ALJ rejected Dr. Noel's opinion because Dr. Noel relied—even relied heavily—on the evaluations of the original treating physicians, we conclude that the ALJ's stated rationale runs afoul of the treatment physician preference.[7]

Moreover, the record discloses that the ALJ's rejection of Dr. Noel's opinion was based on an evident misapprehension of the reasons for Dr. Noel's opinion. Although the ALJ mentioned in his Compensation Order that Dr. Noel treated Ms. Changkit in 2004 and saw her on two dates in 2006, we discern little, if any, recognition, in the ALJ's analysis, of the fact that Dr. Noel was Ms. Changkit's treating physician and that he had seen or treated her at least fifteen times, and eleven times prior to writing his report of July 11, 2006. Since it is agreed upon by all concerned that the issue before the ALJ was whether Ms. Changkit's disability still existed at the time of the hearing and decision, and since it cannot reasonably be doubted that Dr. Noel was fully familiar with Ms. Changkit's condition, it is contrary to common sense to conclude that, in determining that Ms. Changkit remained disabled, Dr. Noel ignored his own examinations and treatment of her, and that he based his assessment of her condition solely on the opinions of Dr. Glor and Dr. Mills many years earlier.[8] The ALJ's apparent con-

---

7. It is worth noting that in reaching his conclusion adverse to Ms. Changkit, Dr. Levitt also relied on prior diagnostic testing.

8. In his report of July 11, 2006, in which he stated his reliance, *inter alia*, on Dr. Mills and Dr. Glor, Dr. Noel began by noting that "Deborah Changkit was seen by me in follow-up

for her left knee and low back and bilateral lower extremity pain." We do not believe that an impartial trier of fact could reasonably believe that Dr. Noel's observations, on this and other occasions, were not among the facts that led him "to have to disagree with any of us who has seen the patient on a

clusion that Dr. Noel relied solely on the earlier reports and had nothing useful of his own to offer, when Dr. Noel had written on May 28, 2004 that he had "reviewed the entire record," was not, in our view, based on "relevant evidence such as a reasonable mind might accept as adequate to support a conclusion." *Black v. District of Columbia Dep't of Employment Servs.*, 801 A.2d 983, 985 (D.C.2002) (internal quotation marks and citation omitted); *see also Mills*, 838 A.2d at 328 (*quoting Black*). Therefore, it was not based on substantial evidence.

Moreover, the ALJ's reliance on Dr. Levitt's third IME report as a basis for rejecting Dr. Noel's opinion is fraught with problems. In 1995, the employer relied on Dr. Levitt's first evaluation, which was unfavorable to Ms. Changkit, but that evaluation was rejected both by the hearing examiner and by the Deputy Director of DOES. In 1999, Dr. Levitt's second report, again proposing termination of benefits, was rejected by the Hearing and Appeals Examiner, who seriously questioned Dr. Levitt's impartiality.[9] In the third proceeding now under review, the ALJ "incorporate[d] by reference" the 1995 and 1999 proceedings, but neither he nor the CRB made any reference to the doubts raised by an impartial Hearing and Appeals Examiner who ultimately ruled in the employer's favor. The unusual history of the case—Dr. Levitt had twice recommended that Ms. Changkit's benefits be terminated and, in each case, his opinion had been rejected, once on the grounds of lack of impartiality—makes it somewhat surprising that he was selected to conduct the IME in the third proceeding involving Ms. Changkit. This odd sequence of events should surely caution the decision-maker in determining whether Dr. Levitt's third recommendation should be followed over those of the current treating physician, Dr. Noel, and of Dr. Noel's predecessors.

We recognize that, in cases of this kind, our review is, and should be, deferential. Nevertheless, we are constrained to conclude that the CRB's decision affirming the Compensation Order is not supported by substantial evidence. Accordingly, the decision of the CRB is reversed. For the reasons stated in this opinion, we conclude that, on this record, no impartial trier of fact could reasonably find in favor of the employer, because there is no substantial evidence to support such a finding. We therefore remand the case with directions that Ms. Changkit's benefits be reinstated and that she be granted all other appropriate relief consistent with this opinion.

*So ordered.*[10]

---

contemporary basis and come to the conclusion that the work-related injuries are not the cause of the current problems."

9. Although the Examiner nevertheless ruled in favor of the employer, the Director reversed the Examiner's decision and held that Ms. Changkit was entitled to continue to receive benefits.

10. The employer contends, *inter alia*, that according to Dr. Levitt, Ms. Changkit was making insufficient efforts to deal with her inju-

ries. The employer also raises several other issues not addressed by the ALJ or the CRB. We explained in *Kralick*, however, 842 A.2d at 713:

Respondent further argues that, regardless of whether the treating physician preference is applicable to the instant case, DOES was permitted to reject the treating physician's opinion if it had a reasonable basis for doing so.... However, neither the Hearing Officer nor the Director relied on any of these reasons in rejecting Doctor

Collins' opinion. *An administrative order can only be sustained on the grounds relied on by the agency; we cannot substitute our judgment for that of the agency.*

(Emphasis added; citations and internal quotation marks omitted); *see generally SEC v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 87 L.Ed. 626 (1943).